Estate of William Mitchell, Deceased, Malcolm T. Mitchell, et al., Executors v. Commissioner.
Estate of William Mitchell v. Commissioner
Docket No. 27925.
United States Tax Court
1952 Tax Ct. Memo LEXIS 312; 11 T.C.M. (CCH) 177; T.C.M. (RIA) 52052; February 27, 1952
Allen G. Gartner, Esq., 815 15th St., N.W., Washington, D.C., and Edward I. Sproull, C.P.A., for the petitioner. Ellyne E. Strickland, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined an estate tax deficiency of $435,015.33 against petitioner. The two contested adjustments to the net estate raise these questions: (1) Whether the value of 233,300 shares of the capital stock of the Maljamar Oil and Gas Corporation is includible in decedent's gross estate; and (2) whether petitioner is entitled to deduction from the gross estate of a claimed debt of $9,789.63. Some of the facts are stipulated. Findings of Fact The stipulated facts are hereby found. William Mitchell, *313 hereinafter referred to as decedent, was born on April 1, 1866, and died testate on December 15, 1945, a resident of Yonkers, New York. Decedent's will was duly admitted to probate in the Surrogate's Court of the County of Westchester and letters testamentary were issued on June 26, 1946, to Malcolm T. Mitchell and Irving T. Bartlett, his son and nephew, respectively. The Federal estate tax return of petitioner, the Estate of William Mitchell, deceased, was filed by the executors with the collector for the fourteenth district of New York, the district in which decedent resided on the date of his death. Decedent was engaged in the brokerage business. Incidental to his brokerage business he became interested and invested some money in activity designed to lead to the discovery and production of oil. Initial efforts in East Texas and Haddam, Kansas, were unproductive, leaving decedent in possession of a quantity of oil well equipment. In the early 1920's decedent heard about a potential oil field then being developed in the State of New Mexico. He interested a few close business associates in the venture and in 1923 organized a corporation under the laws of the State of Delaware, *314 known as Maljamar Oil and Gas Corporation, hereinafter referred to as the company. The name of the company was a contraction of the first names of his three children, Malcolm, Janet, and Margaret Mitchell, who were 12, 10 and 15 years old, respectively, at the time the company was organized. The stock was sold at one dollar a share and the money received by the corporation in exchange for the issuance of stock was used to acquire leases and to finance drilling operations. Of the original issue of 100,000 shares of the company's capital stock, the following shares were issued to decedent, his wife Grace H. Mitchell, and their children: Date
Certificate
Number
Name
of Issue
Number
of Shares
Grace H. Mitchell
12/2/24
A-1
10,000
William Mitchell
12/2/24
A-2
21,800
William Mitchell
12/2/24
A-19
1,000
William Mitchell
12/4/24
A-21
500
Grace H. Mitchell
12/4/24
A-22
5,000
Malcolm T. Mitchell
12/4/24
A-23
150
Janet C. Mitchell *
12/4/24
A-24
100
Margaret Mitchell **
12/4/24
A-25
100
William Mitchell
12/4/24
A-26
150
William Mitchell
12/4/24
A-27
3,000
William Mitchell
12/4/24
A-28
5,000
William Mitchell
12/4/24
A-29
5,000
Total
51,800
*315 In December 1924 the stock was split five for one, resulting in the following shares being issued to decedent and members of his family in exchange for the shares listed in the preceding paragraph: Date
Certificate
Number
Number
Name
of Issue
Old
New
of Shres
Grace H. Mitchell, marked property
of Malcolm T. Mitchell
12/5/24
A-1
A-30
12,500
Grace H. Mitchell, marked property
of Janet C. Mitchell
12/5/24
A-1
A-31
12,500
Grace H. Mitchell, marked property
of Margaret Mitchell
12/5/24
A-1
A-32
12,500
Grace H. Mitchell, marked property
of Malcolm T. Mitchell
12/5/24
A-1
A-33
12,500
William Mitchell
12/5/24
A-2
A-41
109,000
William Mitchell
12/5/24
A-19
A-56
5,000
William Mitchell
12/5/24
A-21
A-58
2,500
Grace H. Mitchell
12/5/24
A-22
A-66
25,000
Malcolm T. Mitchell
12/5/24
A-23
A-59
750
Janet C. Mitchell
12/5/24
A-24
A-60
500
Margaret Mitchell
12/5/24
A-25
A-61
500
William Mitchell
12/5/24
A-26
A-62
750
William Mitchell
12/5/24
A-27
A-63
15,000
William Mitchell
12/5/24
A-28
A-64
25,000
William Mitchell
12/5/24
A-29
A-65
25,000
Total
259,000
*316 After organization of the company decedent served as president and Irving T. Bartlett, also an original stockholder, served as a director. On graduation from Yale in 1934 with a major in geology decedent's son, Malcolm, became a full-time employee of the company. The stock books of the company disclose that of the stock originally issed to decedent (which amounted to 182,250 shares after the five-for-one split in December 1924), 156,400 shares appeared on the records of the company in February 1944 in the names of decedent's relatives, as follows: Malcolm T. Mitchell, son
32,666 shares
Janet M. Kies, daughter
54,167 shares
Margaret M. Hardinge, daughter
53,167 shares
Constance Mitchell, daughter-in-
law
15,000 shares
Barbara Kies, granddaughter
333 shares
Janice Kies, granddaughter
433 shares
June B. Mitchell, granddaughter
434 shares
William Ford Mitchell, grandson
200 shares
156,400 shares All of these 156,400 shares were registered on the books of the company in the names of the persons listed above on dates between July 30, 1935, and July 21, 1941, inclusive. Under date of January 30, 1937, an agreement was entered into by Margaret, Janet, *317 and Malcolm, parties of the first part, and decedent, Irving T. Bartlett and Malcolm, parties of the second part, as "Administrators," whereby all of the certificates of company stock standing in the names of the parties of the first part were deposited with the administrators to be held, voted, and administered by them in accordance with the provisions of the agreement. The purpose of the agreement as recited therein was as follows: "WHEREAS, the parties of the first part are sisters and brother, and are large stockholders of MALJAMAR OIL & GAS CORPORATION, a Delaware corporation, and of MALCO REFINERIES, INC., a New Mexico corporation, the properties of both of which corporations are principally in New Mexico; and "WHEREAS, the parties of the first part believe that their interests in said corporations can be made very valuable if they pursue a united policy during their joint lives and if said interests are managed and administered during their joint lives by the parties of the second part, and are anxious to obtain the services of the parties of the second part therefor; and "WHEREAS, the parties of the second part are willing to undertake said management and administration, *318 but only upon the terms and conditions herein stated." It further provided that the parties of the first part deposit (a) all their stock certificates with the administrators as custodians, either endorsed in blank or accompanied by irrevocable stock powers; (b) proxies to vote all shares; and, (c) dividend orders authorizing the company to pay all dividends on said stock to the administrators. In the event a party of the first part desired to sell all or part of his or her deposited stock he or she was free to do so only after first offering to the other parties of the first part the opportunity to purchase. The agreement could be terminated at any time but only by unanimous action of the parties of the first part. The fourth paragraph of that agreement provided as follows: "FOURTH: The administrators may vote the deposited stock in such manner as they think will best advance the ultimate interests of the parties of the first part. They shall collect all dividends payable thereon, which shall belong to the parties in accordance with the ownership of the stock on which said dividends are paid, and at reasonable intervals shall pay said dividends to the parties of the first part. *319 Any part or all of said dividends may from time to time be paid by the administrators, however, to William Mitchell [decedent] or Grace H. Mitchell, the father and mother of the parties of the first part (the said William Mitchell being one of the administrators), or paid to someone on behalf of either of them, or applied to the use of either of them, should the administrators deem the income of either insufficient to maintain him or her in the comfort to which he or she has been accustomed. Any part or all of said dividends may also from time to time be used by the administrators to purchase additional stock in said corporations or either of them, or in any other oil producing or refining corporation, at such price and upon such terms as the administrators may determine. Any stock so purchased shall belong to the parties of the first part in proportion to their ownership of said dividend moneys, and shall be transferred into their respective names and deposited hereunder. The administrators may sell all or any part of the stock deposited hereunder at any time and from time to time, at such price and upon such terms as the administrators may determine. The purchase money shall forthwith *320 upon receipt by the administrators be paid to the parties of the first part in proportion to their ownership of the stock sold. The determination of the administrators of any question arising hereunder shall be final and conclusive. All decisions of the administrators shall be made by unanimous action. They shall receive no compensation, but their expenses shall be repaid and they shall have a lien upon the deposited stock for such expenses. They shall be liable only for wilful fraud, and no administrator shall be liable for the acts of any other administrator." At the time of the execution of this agreement there stood on the books of the company in the names of decedent's three children a total of 75,000 shares of stock of that company which had been originally issued to decedent and an additional 50,000 shares of stock which they had received from their mother, Grace H. Mitchell. In accordance with the agreement the parties of the first part deposited their stock, the proxies and dividend orders with the administrators. Malcolm's wife, Constance Mitchell, also deposited her stock certificates although she was not a party to the agreement. The administrators paid out some money *321 to decedent or for his benefit but no fixed amounts were paid monthly or annually. Decedent took little active interest in administration under the agreement and did not attempt to dominate Malcolm or Bartlett in their work in carrying out its terms. His two daughters, parties of the first part under the agreement, took no active part in the business and never took issue with the decisions made by Malcolm and Bartlett. On June 14, 1937, decedent executed his last will and testament. In 1941 Bartlett succeeded decedent as president of the company. He immediately launched a drilling program, financed by a loan of $150,000, that proved successful. Dividends of ten cents a share were paid in 1941, 1942, and 1943. Prior to that time the company's operation was small due to limited capital. It had paid its first dividend of six cents a share in 1936. Malcolm had purchased 500 shares of company stock for 75 cents a share in June 1938. In December 1943 the administrators were approached by the president of the Buffalo Oil Company for purchase of the company stock. On February 7, 1944, there were sold to the Buffalo Oil Company at the price of $5.50 per share 233,300 shares of stock *322 of Maljamar Oil and Gas Corporation, being all of the stock standing on the books of the company in the names of the following members of the Mitchell family, including the shares which had been deposited under the agreement of January 30, 1937: William Mitchell [decedent]
100
Grace H. Mitchell
15,300
Malcolm T. Mitchell
50,000
Constance Mitchell
23,000
Janet M. Kies
71,000
Margaret M. Ogden (formerly Margaret
M. Hardinge)
71,000
Barbara Kies
550
Janice Kies
550
June B. Mitchell
900
William Ford Mitchell
900
Total
233,300
Of these total shares of stock, 54,600 shares represented stock which had been given to decedent's three children by their mother on dates between December 5, 1924, and February 16, 1937, inclusive. One hundred fifty-six thousand four hundred shares had originally been issued to decedent and given by him to the children. On July 1, 1944, an agreement was entered into by Malcolm, Margaret, and Janet, as "Settlors," and Irving T. Bartlett, Malcolm, Margaret, and Janet, as "Trustees," whereby each of the three settlors agreed to and did pay to the trustees the sum of $100,000, or a total of $300,000, to be held in trust for *323 the uses and purposes and subject to the terms and conditions therein set out. This sum of $300,000 was derived from the proceeds of the sale to the Buffalo Oil Company of the company stock. The July 1, 1944, agreement, provided in part: * * *
"WHEREAS, the Settlors are the children of WILLIAM MITCHELL, of New York City, New York, and desire to make provision for his support and maintenance for the balance of his life in the manner in which he has been accustomed, insofar as it may be possible: * * *
"(2) The Trustees will receive the said sum of $300,000. * * * and apply the net income therefrom, as follows: "(a) To apply to the use of the said WILLIAM MITCHELL the sum of $10,000. per annum. "(b) To pay over the balance, if any, to the Settlors, their executors and assigns, in equal shares. "(3) In case the net income of said trust shall not equal $10,000. per annum, the Trustees may use such sums of principal as may be necessary in order to make up the said sum of $10,000. per annum. The Trustees may also pay out of principal such sums as they may determine for hospital, medical or other expenses of the said WILLIAM MITCHELL, and for such other purposes as they *324 may deem necessary or proper for his health, comfort and well-being. "(4) The Trustees shall not be required to make payments directly to the said WILLIAM MITCHELL, and the said WILLIAM MITCHELL shall have no right to require that payments be made to him or to his assignees; but the Trustees may pay taxes, insurance, repairs, maintenance and other charges on any of his properties (including his real estate at Lake George, New York, now held in the name of a corporation of which he owns all the capital stock), or such of his bills or other obligations as they may from time to time determine. For such purpose the Trustees shall not be required to make inquiry as to the validity of any tax, bill, or other charge, but may treat as binding on the said WILLIAM MITCHELL and enforce any bill or claim addressed to him. Any payment so made by the Trustees in good faith shall be equivalent to payment to the said WILLIAM MITCHELL, personally." It was further provided that the trust agreement was to take effect upon receipt by the trustees of the $300,000 corpus and terminate upon death of decedent, beneficiary. Upon termination the principal of the trust was to be sold and "* * * the net proceeds *325 divided and paid over to the Settlors, their executors and assigns, in equal shares." The July 1, 1944, agreement was entered into by decedent's three children of their own volition in order to provide support and maintenance to decedent, if he needed it; they being aware of his reduced income and desiring to share equally the burden if any. Decedent was a sociable person and liked good food and drink. He was short in stature, rotund of person, and quite active although restricted somewhat because of a childhood poliomyelitis infection leaving his left arm weak. In May 1936, decedent suffered a stroke or "cerebral incident." He was confined at home in bed for about nine or ten days with that illness which left him with a slight speech impediment. During the month of June that year he was confined to his home and was under his physician's observation. In July he went to his summer place on Lake George, New York, where he had a good summer, remaining until carly October. Thereafter he was as active as before. In the summer of 1940, while at Lake George, decedent suffered a cerebral hemorrhage from which he was hospitalized for seven weeks. His speech impediment was somewhat aggravated; *326 no paralysis resulted but he experienced difficulty in getting around due more to his build and old poliomyelitis weakness than to this illness. Decedent's physician called periodically during the rest of the year and until decedent again returned to Lake George in the summer of 1941. In February of 1941 decedent was able to walk; by March that year he occasionally went for rides in his car and during April and May he was feeling better and taking rides more often. Following his return from Lake George in the fall of 1941 he went down to his office every day; his general physical condition was good for a man of his age though there was a slowness of cerebration. In 1942, when the brokerage firm of which decedent had been a member merged with another firm, he retired from business. Thereafter decedent went downtown less frequently than formerly, partly on account of his physical condition, and partly because of the gasoline shortage occasioned by the war. Decedent consulted his physician on January 16, 1945, for a little pain in his upper abdomen. The physician's next call was on December 15 that year and upon arrival he found decedent in a chair, dead, following a heart attack. *327 Decedent filed a gift tax return for 1936 reporting gifts of 15,000 shares of company stock each to Malcolm, Janet, and Margaret, and 10,000 shares to Malcolm's wife, Constance. A gift tax return was also filed by decedent for 1937 listing gifts of 20,000 shares of company stock each to Margaret and Janet, and 5,000 shares each to Malcolm and Constance. Gifts of 5,000 shares each to Malcolm, Janet, and Margaret were reported in 1939. The Federal estate tax return filed by decedent's executors listed his gross estate at $64,469.48 and deductions, including the specific exemption, of $118,613.81. No estate tax was reported as due. Schedule K, attached to the return, listed decedent's debts, in part, as follows: "On Dec. 23, 1944, decedent owed $9,789.63 to E. A. Pierce & Co., In Liquidation, brokers, of which firm decedent had been a member. On this date Malcolm Mitchell, Janet M. Jacobsen and Margaret M. Ogden, the three children of decedent, paid said sum to said firm upon request of their father. "Interest thereon to Dec. 15, 1945, $590.64" In the statement attached to petitioner's deficiency notice respondent listed the following adjustments: ADJUSTMENTS TO NET ESTATE
Net estate for basic tax as dis-
closed by return
($54,144.33)
Additions to value of net estate
and decreases in deductions: Stocks and Bonds
15.00
Transfers During Decedent's Life
$1,283,150.00
Debts of Decedent
9,789.63
$1,238,810.30
Reductions in value of net estate
and increases in deductions: Attorneys' Fees
500.00
Net estate for basic tax as ad-
justed
$1,238,310.30
Net estate for additional tax as
adjusted
$1,278,310.30
*328 Respondent explained the adjustments to the net estate, in part, as follows: Returned
Determined
Transfers During Dece-
dent's Life
$0.00
$1,283,150.00
"It is determined that 233,300 shares of the capital stock of Maljamar Oil and Gas Corporation having a value of $1,283,150.00 at the date of the decedent's death forms a part of the decedent's gross estate under the provisions of Sections 811 (a), (c) and (d) of the Internal Revenue Code. * * *
Debts of
the Decedent
Returned
Determined
Item 1
$9,789.63
$0.00
"The above item is disallowed as a deduction, it is being determined the same was not a debt of the decedent." Decedent did not transfer any of the stock, the value of which was included in his gross estate, in contemplation of death. Opinion The only issue seriously presented is whether decedent's transfers were made in contemplation of death. They were the culmination of a program which began in 1924, when estate tax rates were comparatively low, and continued for almost twenty years. United States v. Wells, 283 U.S. 102. The gifts were made in the stock of a company which decedent organized avowedly *329 to afford his children a future livelihood and which he named for them. Decedent was a comparatively young man when he inauguarted the series of gifts, and was apparently in excellent health and spirits. None of these considerations is conclusive, but they confirm the motive for the transfers advanced by petitioner that decedent was interested in purposes connected with life and not concerned with the prospect of death. United States v. Wells, supra. We have made the critical finding accordingly, which disposes of the question. A second point, concerning the deductibility of an alleged claim against the estate, cannot require consideration in this posture of the matter in view of the obvious excess of other deductions and exemptions over the estate assets. Decision will be entered for the petitioner. Footnotes
*. Later Janet M. Kies, then Janet M. Jacobsen. ↩
**. Later Margaret M. Hardinge, then Margaret M. Ogden.↩